UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRUCE I. WINTERS,

                         Plaintiff,

    -v-

AMERICAN EXPRESS TAX AND BUSINESS
SERVICES, INC.,

                      Defendant.

Case No. 04-CV-8451 (KMK)

OPINION AND ORDER

Appearances:

Neal L. Moskow, Esq.
Ury & Moskow, LLC
Fairfield, Connecticut
*Counsel for Plaintiff*

Jean Young Park, Esq.
Kelley Drye & Warren, LLP (NY)
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      Plaintiff Bruce I. Winters brings this action to recover money allegedly owed to him by

his former employer, Defendant American Express Tax and Business Services, Inc. ("TBS").

Specifically, Plaintiff alleges that when TBS terminated his employment on February 11, 2003,

TBS owed him a minimum of $33,333.33 in deferred partnership income, $15,340.00 in

incentive pay, and $20,595.95 in paid time off ("PTO").  (Pl.'s Mem. of Law in Opp'n to Mot.

for Summ. J. ("Pl.'s Mem.") 5-7.)  Plaintiff further alleges that TBS wrongfully deducted funds

from his wages, in violation of New York Labor Law section 193(a).  (*Id.* at 17-19.)  With this

motion, TBS seeks summary judgment with respect to each of Plaintiff's outstanding claims.  For

the reasons stated below, TBS's Motion for Summary Judgment is GRANTED in part and
DENIED in part.

## I.  Background

Plaintiff and TBS present dramatically different versions of the facts.  These differences,
upon which this motion turns, are identified below.  The Parties agree that Plaintiff began
working for TBS on June 4, 1999, as a "Band-35" Senior Manager responsible for technology-
related matters at TBS's New York office.[1]  (Pl.'s Rule 56.1 Counter-Statement of Material Facts
in Supp. of His Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s 56.1 Stmt.") ¶ 6.)  The Parties also
agree that on February 11, 2003, Plaintiff was discharged from his positions at TBS and GGK
and performed no further work for the companies.  (Winters Dep. 27:9-29:15; Def.'s Rule 56.1
Statement of Undisputed Material Facts ¶ 29 ("Def.'s 56.1 Stmt.").)  What happened between
June 4, 1999 and February 11, 2003 is what this lawsuit is all about.

### A.  Plaintiff's Relationship to GGK and the Deferred Compensation Plan

In July 2000, Plaintiff was promoted to Band-40 Lead Managing Director at TBS.  (Pl.'s
56.1 Stmt. ¶¶ 8, J.)  Plaintiff also claims that around this time he was promoted to partner at
Goldstein, Golub and Kessler ("GGK"), an entity that he identifies as a wholly-owned subsidiary
of TBS.  (Winters Aff. ¶ 7; Winters Dep. 34:2-12.)  According to Plaintiff, he was invited to join
the GGK partnership by Gerry Golub ("Golub"), the "president of GGK and the chairman of
TBS."  (Winters Dep. 34:7-9, 46:25-47:8.)  In several subsequent conversations, Golub allegedly
also informed Plaintiff of the responsibilities and benefits attendant to the partnership position.

---

[1]TBS employees are ranked by "band levels."  A higher band level indicates a more
senior position at the company.  (*See* Winters Dep. 29:22-31:6.)

(*Id.* at 47:6-13.)  Plaintiff never received a written partnership agreement memorializing either his promotion or the responsibilities and benefits of partnership as presented by Golub.  (*Id.* at 46:3-4.)

Among the partnership benefits purportedly agreed to by Plaintiff and Golub was the opportunity to receive what Plaintiff alternately refers to as "deferred compensation," "Partnership Income," and "Partnership Distribution."  (*Id.* at 47:6-13; Winters Aff. ¶ 15.) Plaintiff defines deferred compensation as "the monies you received at the end of the year, that included your share of the equity, your share of the profits and your share . . . in GGK, that was left from what you had not drawn during the year as a salary."  (Winters Dep. 62:20-25.) However, Plaintiff admits that he does not know how this amount was calculated.  (*See id.* at 262:22-25.)  Although the so-called deferred compensation was allegedly related to Plaintiff's partnership in GGK, it was paid by TBS.  (*Id.* at 64:14-16.)  And while this compensation was paid in a lump sum, according to Plaintiff, it was not a bonus.  (*Id.* at 49:9-10.)

Plaintiff claims that over the course of his employment at TBS he received two such deferred compensation payments:  In 2001, he received deferred compensation of $57,432 relating to his employment from May 1, 2000 through April 30, 2001 (*id.* at 189:25-192:16); and in 2002 he received deferred compensation of $49,096 for his employment from May 1, 2001 through April 30, 2002.  (*Id.* at 198:6-20.)  Plaintiff believes that he was entitled to an additional deferred compensation payment for the work that he performed from May 1, 2002, through the date of his termination, which Plaintiff estimates is $33,333.33.[2]

---

[2]Plaintiff arrives at this figure by taking the annual "historical averages" of his deferred compensation payments, which he puts at $50,000, and prorating that amount based on the fact that he left TBS having worked only two-thirds of the fiscal year.  (*See* Winters Aff. ¶ 15.)

TBS disputes Plaintiff's characterization of these payments.  In TBS's view, the lump

sum payments that Plaintiff received in 2001 and 2002 were bonus or incentive payments, not

deferred compensation.  (*See* Def.'s 56.1 Stmt. ¶¶ 40-42, 71; Price Decl. ¶ 27.)  TBS

acknowledges that it offered a "deferred compensation plan" to some employees, but claims that

that plan was only available to "senior level employees, starting with Band 50-level Vice

Presidents and above," and that "Mr. Winters was not eligible to participate and did not

participate" in any such plan.  (Price Decl. ¶¶ 37-38.)

    B.  The Incentive Award Program

On October 1, 2001, TBS launched the Incentive Award Program ("Incentive Program").

(Price Decl. ¶ 16; Winters Dep. 200:8-12; Park Aff. Ex. N.)  According to Plaintiff, prior to the

roll-out of the Incentive Program, TBS had regularly issued discretionary bonuses to its

employees under varying plans and based on subjective criteria.  (Winters Dep. 181:12-14; *see*

*also* Price Aff. ¶ 28.)  The Incentive Program was intended to replace these discretionary bonuses

with a unified and more objective system.  (Winters Dep. 180:20-25.)  Towards that end, the

Incentive Program "plan description" explained in detail how the Incentive Program awards were

calculated, setting forth several quantifiable criteria, including individual achievement ratings

and office performance.  (Park Aff. Ex. N.)  The plan description, which Plaintiff acknowledges

having read (Winters Dep. 179:12-17), also included a "switching plans proration" provision,

under which any Incentive Award would be prorated in cases where an eligible employee was

already being compensated through a different TBS incentive program.  (*Id.*)  This proration

provision was intended to prevent employees from being compensated under two separate

incentive programs for work performed during the same period, thereby receiving a windfall.

4

(*Id.*; Price Aff. ¶¶ 24-26.)

Plaintiff acknowledges that he received two payments under a discretionary bonus regime that preceded the Incentive Program:  In January 2000, he received a $15,000 bonus payment; and in March 2000, he received a $25,000 bonus payment.  (Winters Dep. 197:5-15.)  Plaintiff further acknowledges that he received lump sum payments of $57,432 in September 2001 and $49,096 in September 2002; however, Plaintiff claims that these later payments were not bonus or incentive payments, but rather the deferred GGK partnership compensation discussed above. (*Id.* at 199:7-14.)  Plaintiff also acknowledges receiving a payment of $38,000 in January 2003.[3] (Winters Aff. ¶ 17.)  Plaintiff argues that the switching-plans proration provision did not apply to him and he is therefore entitled to an Incentive Program award for the first year of the program. Moreover, Plaintiff claims that in the last quarter of 2002, his manager, Jeffrey Geisler ("Geisler"), confirmed as much, promising Plaintiff that he would receive an Incentive Program award in the amount of 25.4% of his annual salary, or $53,340.  (*Id.* at 227:12-24; Winters Decl. ¶ 17.)  Thus, having been paid $38,000 in January 2003, Plaintiff seeks the difference of $15,340.

In contrast, TBS argues that Plaintiff was ineligible for an Incentive award during the first year of the Incentive Program because he was covered under a separate bonus program.  TBS points to the lump sum payment that Plaintiff received in September 2002, arguing that this

---

[3]According to TBS, this was an Incentive Program payment, which was calculated based on Winters's annual salary of $210,000, his individual performance rating, and the national and local office performance ratings.  Based on these factors, TBS claims that Winters was eligible to receive 25.4% of his salary under the Incentive Program.  This amount was then prorated because, according to TBS, Winters received an incentive payment under a bonus program for the 12-month period prior to May 1, 2002.  Geisler subsequently increased Winters's bonus by $2440 pursuant to the discretionary adjustment provisions of the Incentive Program, resulting in the payment of $38,000.  (Def. Mem. 12.)

payment was not deferred compensation, as Plaintiff claims, but was instead an "annual bonus payment . . . for the period [of] May1, 2001 through April 30, 2002." (Price Aff. ¶ 27.) As such, the proration provision of the Incentive Program applied, and Plaintiff was "not entitled to additional monies under the Incentive Program over this same time period." (*Id.*)

### C. Paid Time Off

During the period at issue, vacation days, personal days, and "business driven holidays" were all addressed at TBS through its written Paid Time Off ("PTO") policy. (Park Aff. Ex. F.) Pursuant to the PTO policy, employees of Plaintiff's band level and seniority accrued 224 hours of PTO each year. (Def.'s 56.1 Stmt. ¶ 13.) The PTO policy required that any PTO hours "be taken in the calendar year in which they are earned . . . . [or else] be forfeited." (Park Aff. Ex. F.) However, both Plaintiff and TBS acknowledge that there was an unwritten exception to the PTO policy, under which employees were permitted to carry PTO hours into subsequent years under "extraordinary business circumstances." (Winters Dep. 109:5-13, 131:2-25, 145:16-18; Geisler Dep. 110:24-112:22.)

Plaintiff claims that, due to such extraordinary business circumstances, Geisler granted Plaintiff permission to carry forward his vacation time from 2001 into 2002, and that Geisler and Kent Price ("Price") together permitted him to carry vacation time from 2002 into 2003.[4] (Winters Dep.109:5-13, 131:2-25, 142:25-143:21, 145:16-18, 146:9-21.) Plaintiff further claims that these agreements are evidenced in emails sent among Plaintiff, Geisler, and Price. (Winters Aff. ¶ 20; Park Aff. Exs. H-K.) According to Plaintiff's calculations, taking into account the

---

[4]From 2001 through the date of Plaintiff's termination at TBS, Price held the title of Vice President, Relationship Leader of Human Resources. (Price Decl. ¶ 1.)

6

unused PTO hours that Plaintiff carried forward into 2002 and 2003, Plaintiff was owed 287 hours of PTO at the time of his termination. (Winters Aff. ¶¶ 20-21; Park Aff. Ex. J.) Because he was only credited with 147 hours of PTO, he seeks the difference. (*See* Park Aff. Ex. J.)

TBS does not dispute that Plaintiff was granted permission to carry forward his hours from 2001 into 2002 and again from 2002 into 2003. However, according to TBS, even under extraordinary circumstances, TBS employees were only permitted to carry PTO hours into the *first quarter* of the year subsequent to which the hours were accrued. Any PTO hours not used in the first quarter of that subsequent year were forfeited. (Price Dep. 49:17-50:4; Park Aff. Ex. H.) According to TBS, in 2002, Plaintiff carried over 213 PTO hours from 2001, accrued 224 new PTO hours, and used only 150 hours. (Def.'s 56.1 Stmt. ¶ 34.) Fifty-four of the hours used by Plaintiff were used during the first quarter of 2002 and were thus charged against the 213 hours that he had carried over from the previous year.[5] (*Id.*) The remaining 96 hours that Plaintiff used in 2002 were deducted from the 224 hours that he accrued in that year, leaving 128 hours to be carried over into 2003. (*Id.*) TBS calculates that Plaintiff earned another 19 hours in 2003, and he was therefore credited with 147 hours at the time of his termination. (*Id.*)

### D. Alleged Overpayment and Withheld Funds

On February 21, 2003, TBS issued a check to Plaintiff for 80 hours of work during the period from February 10 through February 23, 2003. (Def.'s 56.1 Stmt. ¶ 30; Winters Dep. 171:14-25.) TBS claims, and Plaintiff does not dispute, that this check constituted an overpayment of 64 hours, as Plaintiff performed only 16 hours of work during that pay period.

---

[5] According to TBS, the remaining 159 PTO hours from 2001 were forfeited when Plaintiff did not use them by the first quarter of 2002. (Def.'s 56.1 Stmt. ¶ 26.)

(Def.'s 56.1 Stmt. ¶ 30; Winters Dep. 171:14-25.)  Plaintiff has never repaid the excess amount. (Winters Dep. 171:14-25.)

On May 8, 2003, TBS issued a check to Plaintiff for eighty-three PTO hours.  (Def.'s 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.)  To arrive at this number, TBS offset the 147 PTO hours that it claims were owed to Plaintiff at the time of his termination by the sixty-four hours of claimed overpayment in the February 21, 2003 check.  (Def.'s 56.1 Stmt. ¶ 34.)  Plaintiff alleges that this setoff was withheld in violation of New York Labor Law section 193.

## II.  Discussion

### A.  Standard of Review

#### 1.  Summary Judgment Standard

Summary judgment is governed by Federal Rule of Civil Procedure 56.  Pursuant to Rule 56(c), "[s]ummary judgment is appropriate when after viewing all the facts in the record in a light most favorable to the non-moving party, there is no genuine issue of material fact present, so that 'the moving party is entitled to judgment as a matter of law.'"  *Forsyth v. Fed'n Employment and Guidance Serv.*, 409 F.3d 565, 569 (2d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  "Such relief for the moving party may be appropriate after discovery if the non-moving party cannot prove an 'essential element of her case,' that is, one for which she bears the burden of proof."  *Forsyth*, 409 F.3d at 569 (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)).

The burden is on the movant to show that there is no genuine factual dispute.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  "In deciding a motion for summary judgment, all ambiguities

must be resolved and all reasonable inferences drawn in favor of the party opposing the motion." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 61 (2d Cir. 2000) (citing *Anderson*, 477 U.S. at 255); *see also Giannullo*, 322 F.3d at 140. "If the evidence is such that, when viewed in the light most favorable to the nonmoving party, a reasonable fact finder could return a verdict for that party, then a genuine issue of material fact exists, and summary judgment is not warranted." *Magan v. Lufthansa German Airlines*, 339 F.3d 158, 161 (2d Cir. 2003) (citing *Green Door Realty Corp. v. TIG Ins. Co.*, 329 F.3d 282, 286-87 (2d Cir. 2003)).

However, Fed. R. Civ. P. 56(e) provides that the adverse party "may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Thus, "[o]nce a moving party has made a showing that no material issues of fact are in dispute, mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion." *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985); *see also Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 466 (S.D.N.Y. 1998).

## 2. New York Breach of Contract Standard

At bottom, this action is a contract dispute governed by New York law. Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages resulting from the breach." *Bierer v. Glaze, Inc.*, No. 05 Civ. 2459, 2006 WL 2882569, at *4 (E.D.N.Y. Oct. 6, 2006) (internal quotations omitted); *accord Arnone v. Deutsche Bank*, No. 02 Civ. 4915, 2003 WL 21088514, at *2 (S.D.N.Y. May 13, 2003). A contract exists if a "'meeting of the minds has

occurred as to the contract's material terms.'" *Zhao v. State Univ. of N.Y.*, No. 04 Civ. 0210, 2007 WL 81934, at *24 (E.D.N.Y. Jan. 9, 2007) (quoting *Michael Coppel Promotions Pty. Ltd. v. Bolton*, 982 F. Supp. 950, 954 (S.D.N.Y. 1997)).  "Additionally, where, as here, the issue centers upon whether the parties have entered into an oral agreement, the court looks not to the parties' after-the-fact professed subjective intent, but rather at their objective intent as manifested by their expressed words and conduct at the time of the agreement." *Dzek v. Desco Vitroglaze of Schenectady Inc.*, 727 N.Y.S.2d 814, 815 (App. Div. 2001) (internal quotations omitted).

B.  The Incentive Award Program

Plaintiff claims that he is entitled to $15,340 from the Incentive Award Program above and beyond the $38,000 that he received in January 2003.  The Parties agree that an Incentive Program was in place at TBS in October 2001 and that Plaintiff performed his duties at TBS such that he was entitled to compensation under either the Incentive Program or a different bonus plan.  As such, the existence of a contract and Plaintiff's performance under that contract are not in dispute.  *See Bierer*, 2006 WL 2882569, at *4 (listing elements of a breach of contract claim under New York law).  Instead, the Parties' dispute revolves around the third element of a contract claim:  breach.  Specifically, TBS argues that the 2002 lump sum payment of $49,096 was a bonus, such that the Incentive Program award was properly prorated; whereas Plaintiff argues that the 2002 payment was an independent form of deferred compensation unrelated to the Incentive Program and that TBS's failure to pay him an award under the Incentive Program therefore constituted breach of his employment agreement as set forth in the Incentive Program.  Put another way, Plaintiff's claim regarding the Incentive Program depends on his claim regarding deferred compensation, which for reasons discussed below, crumbles to nothing.

10

In support of its position, TBS submits Price's affidavit, in which Price attests that "Winters had received an annual bonus payment of $49,096 from Mr. Golub for the period [of] May 1, 2001 though April 30, 2002 and was not entitled to additional monies under the Incentive Program over this same time period." (Price Aff. ¶ 27.) TBS also submits a document from Golub's records, which describes the 2002 payment as a "bonus." (Park Aff. Ex. M.) In light of this evidence, in order to create a genuine issue of fact with respect to the 2002 payment, Plaintiff must come forward with evidence such that a reasonable trier of fact could find that the payment constituted something other than incentive pay. Plaintiff is unable to do so.

Throughout this litigation, when attempting to explain the 2001 and 2002 lump sum payments, Plaintiff has been indirect and unclear. Where expedient, he has alternately described the payments as deferred compensation, partnership income, and partnership distribution. (*E.g.*, Winters Dep. 47:11-48:1; Winters Aff. ¶ 15.) Ultimately, however, when asked directly for an explanation of these payments during his deposition, Plaintiff was forced to admit that he had "no understanding" of how any of the so-called deferred compensation payments were calculated. (Winters Aff. 256:22-25.) The shaky factual foundation upon which Plaintiff's deferred compensation allegations rest is captured in the following exchange during Plaintiff's deposition:

> Q: . . . So your only knowledge of the deferred compensation program is that it was some component of your total compensation that would be paid at the end of the year?
>
> A: Correct.
>
> Q: And . . . you're not aware of any other term or condition of this deferred compensation program?
>
> A: Not that I could recollect.

(Winters Dep. 254:6-15.)  Indeed, Winters admitted during his deposition that the very term

"deferred compensation" was his own invention:

> Q:  So it's your sworn testimony that Mr. Golub told you that as a
> partner you would be part of a deferred compensation plan?
>
> A:  I wouldn't say that he said those exact words.
>
> Q:  Did he ever use the term deferred compensation with you, Mr.
> Winters?
>
> A:  I don't know if he used those words
>
> Q:  Why are you using them then?
>
> A:  Because that's how I define that compensation.

(Winters Dep. 47:14-48:2.)

Plaintiff's admitted ignorance (at best) of the nature of the 2002 payment is fatal to his

claim that TBS breached its Incentive Program obligations.  Faced with Price's sworn assertion

that the 2002 payment was a bonus payment under the Incentive Program, Plaintiff must come

forward with some evidence that supports his version of this "essential element of [his] case."

*Forsyth*, 409 F.3d at 569 (internal quotations omitted).  Because he cannot, he presents no

genuine issue of material fact regarding the Incentive Program compensation and TBS's motion

for summary judgment is granted with respect to this claim.

### C.  Deferred Compensation Payment

Consistent with his allegation that the 2001 and 2002 lump sum payments constituted

deferred partnership compensation, Plaintiff argues that he is owed $33,333 in deferred

compensation for his partnership work from May 1, 2002, through the date of his termination.  In

support of this claim, Plaintiff relies on his allegations, discussed above, that he received such

deferred compensation payments in 2001 and 2002.  Based on these two payments, and based on

a supposed agreement with Golub, Plaintiff asks the Court to assume the existence of an

agreement, the terms of which entitle Plaintiff to receive a similar, prorated payment for his final months at TBS.

Unlike his claim to an award under the Incentive Program, with this claim Plaintiff fails to satisfy even the first prong of a breach of contract claim – namely, the existence of a contract.[6] Put simply, Plaintiff is unable to point to any agreement or program under which he was entitled to receive a set, prorated payment at the time of his departure from TBS.  Instead, as noted, Plaintiff has admitted that the phrase "deferred compensation" was one he invented to describe his conversations with Golub.  (Winters Dep. 49:2-8.)  Even according to Plaintiff, Golub never used the words "deferred compensation" in his conversations with Plaintiff.  (*Id.* at 48:17-48:3.) More importantly, Plaintiff admits that he does not know how the so-called deferred compensation payments were calculated (Winters Dep. 252:22-25), and that, unlike the Incentive Program, he was entitled to "no guaranteed amount" under the alleged deferred compensation plan.  (*Id.* at 272:20-21.)  Furthermore, even if Plaintiff had a basis from which to claim that deferred compensation payments were guaranteed, he admits that he does not know whether, having left TBS before any such deferred compensation fully accrued, he was entitled to a pro rata share of that guaranteed amount.  (*Id.* at 273:15-18.)

As outlined above, to establish the existence of a contract under New York law, Plaintiff must show that a "meeting of the minds" was reached.  *Zhao*, 2007 WL 81934, at *24.  Here, the evidence unequivocally shows that Plaintiff's mind was all alone in creating the idea of deferred compensation.  There is simply no evidence that Plaintiff entered into an agreement which

---

[6]Because Plaintiff admits that there was no written partnership agreement (Winters Dep. 46:3-4), his claim here rests on an alleged oral agreement.

entitled him to a guaranteed, pro rata deferred compensation payment in the event that he left

TBS.  Accordingly, given Plaintiff's admission that the so-called deferred compensation was not

guaranteed, and given his further admission that, in any event, there existed no agreement under

which deferred compensation would be distributed pro rata, the Court finds that Plaintiff has

failed to present a genuine issue for trial.  Plaintiff's admitted lack of knowledge with respect to

these material issues renders his self-serving claim to deferred compensation no more than "mere

conjecture or speculation."  *Quarles*, 758 F.2d at 840.  TBS's motion for summary judgment with

respect to Plaintiff's claim for deferred compensation is therefore granted.

    D.  Paid Time Off

        1.  Breach of Contract

      Plaintiff's PTO claim is also based on an alleged breach of contract and again turns on a

basic factual dispute.  Plaintiff and TBS agree that, despite TBS's written PTO policy to the

contrary (Park Aff. Ex. F), under some circumstances TBS employees were permitted to carry

forward unused PTO time from one year to the next.[7]  (Winters Dep. 109:5-13, 131:2-25, 145:16-

18; Geisler Dep. 110:24-112:22 (noting that PTO hours could be carried forward under

"[e]traordinary business circumstance[s]").)  Both sides also agree that Plaintiff was permitted to

carry his PTO hours forward from 2001 into 2002 and from 2002 into 2003.  (Def.'s 56.1 Stmt. ¶

34 (summarizing TBS's characterization of Plaintiff's PTO accrual); Winters Dep. 109:5-13,

131:2-25, 145:16-18; Geisler Dep. 112:19-22 (acknowledging that in late 2002 the circumstances

existed to permit Plaintiff to carry forward his PTO hours).)  However, TBS claims that any PTO

---

      [7]TBS's published PTO policy states that "[u]nused PTO days will not carry over from
year to year and any days that are accrued but not taken will be forfeited."  (Park Aff. Ex. F.)

hours that Plaintiff carried forward from 2001 into 2002 were forfeited to the extent that they were not used in the first quarter of 2002; while Plaintiff claims that he was permitted to carry his 2001 hours into 2002 without this limitation as to their use.  (Winters Dep. 151:23-158:9.)

On the record currently before the Court, this is not a dispute that can be decided on summary judgment.  Because the dispute revolves around PTO hours that Plaintiff accrued in 2001, to survive summary judgment, Plaintiff must come forward with evidence such that a jury would be able to find that:  1) at the end of 2002, Plaintiff still retained the PTO hours that he had accrued in 2001; *and* 2) he was permitted to carry those hours forward into 2003.  In support of the first proposition, Plaintiff claims that he was "told by Mr. Geisler at the end of 2001" that he would be permitted to carry forward 213 PTO hours from 2001 into 2002 and that Plaintiff in fact did so.  (Winters Dep. 102:15-18, 105:3-9, 109:9-14.)  TBS is unable to directly dispute this claim, as Geisler simply "do[es]n't recall" whether he and Plaintiff came to such an agreement (Geisler Dep. 66:23-67:12), and neither Party has submitted any time sheets or other documentation memorializing Plaintiff's PTO use.[8]  Moreover, it is not contested that Plaintiff used 239 hours of PTO in 2001 (Park Aff. Ex. I at 954) and that he was nevertheless permitted to carry forward 213 hours into 2002.  (Def.'s 56.1 Stmt. ¶ 34 (listing "PTO Carry Over Into 2002" as 213).)  This indicates that prior to 2001 Plaintiff had been permitted to carry forward PTO hours across two consecutive years (from 1999 into 2001) and thus adds credence to Plaintiff's

---

[8]The Court notes that, during his deposition, Geisler testified that "records . . . reflect[ing] Mr. Winters' PTO utilization . . . . would have been maintained at the TBS New York Time and billing system."  (Geisler Dep. 76:3-21.)  However, no such records have been submitted to the Court.

contention that a similar agreement was in place with respect to his 2001 PTO hours.[9]

TBS nevertheless contends that, pursuant to company policy, during the period in question, no employee was permitted to carry PTO hours forward past the first quarter of the year subsequent to which the hours accrued.  (Def.'s Mem. 7.)  This conflicts with TBS's published PTO policy, which does not permit employees to carry forward any PTO, even into the first quarter.  (Park Aff. Ex. F ("Unused PTO days will not carry over from year to year and any days that are accrued but not taken will be forfeited.").)  However, it is consistent with a November 2002 email, containing the subject line "2002 PTO Cash-Out/Carry-Over," which states that "any PTO time carried over to next year must be used by March 15, 2003."  (Park Aff. Ex. H.)

This email, however, which was distributed approximately a year after Plaintiff was allegedly permitted to carry forward the disputed 2001 hours and which was sent to neither Plaintiff nor Geisler, is of no help to TBS.  In assessing whether an oral agreement was formed, "the court looks not to the parties' after-the-fact professed subjective intent, but rather at . . . their expressed words and conduct at the time of the agreement."  *Dzek*, 727 N.Y.S.2d at 815 (internal quotations omitted).  Here, Plaintiff testified at his deposition that TBS, through Geisler, orally agreed to allow him to carry forward his 2001 PTO hours into 2002, without restriction, a concession that was consistent with the company's prior conduct.  And although a trier of fact will be permitted to assess Plaintiff's credibility with respect to this claim, nothing in the record contradicts it.  On the contrary, Geisler is unable to dispute Plaintiff's version of the agreement

---

[9]Under TBS's PTO policy, Plaintiff accrued 224 PTO hours each year.  (Def.'s 56.1 Stmt. ¶ 13.)  In two years' time, then, Plaintiff would accrue 448 PTO hours.  Accordingly, Plaintiff could not have, in the same year, utilized 239 PTO hours and carried forward 213 hours – a total of 452 hours – without at some point having carried PTO hours forward across two consecutive years.

and, indeed, Plaintiff had previously been permitted to carry PTO hours forward beyond the first quarter of the following year.  Accordingly, a jury could find that, in late 2001, Plaintiff was permitted to carry forward his PTO hours into 2002, without restriction.

This gets Plaintiff halfway there, as Plaintiff must also establish that he entered an agreement with TBS whereby he was permitted to carry those hours forward again, into 2003. Towards this end, Plaintiff testified during his deposition that both Geisler and Price promised him near the end of 2002 that he could carry his hours forward into 2003.  (Winters Dep. 146:9-17.)  According to Plaintiff, Price and Geisler each separately made this promise over the phone. (*Id.* at 146:18-147:19.)  Plaintiff also contends that his agreement with Geisler was memorialized in a series of emails between Plaintiff and Geisler.  (*Id.* at 147:19-149:10.)

However, the emails that Plaintiff references simply do not support his claim that an agreement was in place.  On the contrary, the emails indicate that, by the close of 2002, Plaintiff and TBS had yet to reach an agreement regarding Plaintiff's PTO.  For example, in separate emails to Price and Geisler dated January 1, 2003, Plaintiff summarizes his PTO hours and states that he "would like to close this out."  (Park Aff. Ex. I.)  This is hardly indicative of an agreement being in place.  Rather, it suggests that negotiations regarding Plaintiff's PTO carryover were still in progress, or, indeed, had yet to begin.  The credibility of Plaintiff's deposition testimony on this point is therefore significantly undermined.

Nevertheless, at the summary judgment stage, it is not the Court's responsibility to assess credibility.  That task falls to the trier of fact at trial.  *Scholastic, Inc. v. Harris*, 259 F.3d 73, 87 (2d Cir. 2001).  While the emails call into question Plaintiff's claims regarding his agreements with Price and Geisler, after hearing Plaintiff's testimony at trial, a trier of fact might still

reasonably credit those claims.  The emails are certainly of probative value, but they are not sworn statements and they do not directly contradict Plaintiff's deposition testimony.  *Cf. Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous *sworn* statement . . . without explaining the contradiction or attempting to resolve the disparity." (emphasis added)); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").  Accordingly, because at this stage the Court must credit Plaintiff's sworn deposition testimony regarding his claimed agreement to carry 287 PTO hours forward from 2002 into 2003, summary judgment on this claim is inappropriate.  At trial, of course, not all ambiguities and inferences will necessarily be resolved in Plaintiff's favor and the emails will perhaps not be so easily disregarded.

### 2.  Damages

Finally, TBS argues that even if Plaintiff survives summary judgment, his calculation of damages is inaccurate.  On this point the Court agrees.  Plaintiff calculates his unpaid PTO to be $20,595.84.  Plaintiff arrives at this sum by multiplying his $100.96 hourly rate by his 287 claimed PTO hours and offsetting that by the 83 PTO hours for which he was paid on May 8, 2003.  (Winters Aff. ¶ 23.)  But this calculation ignores the overpayment of 64 hours of wages that TBS erroneously provided to Plaintiff for the pay period ending February 23, 2003 – payment that Plaintiff does not dispute was made in error.  (Winters Dep. 171:14-25.)  As such,

18

taking all payments into account, if Plaintiff should succeed at trial, he is at most entitled to payment for 159 PTO hours, or $16,052.64.

E.  New York Labor Law Section 193

Plaintiff also claims that TBS withheld money from Plaintiff's wages in violation of New York Labor Law section 193.  Section 193 prohibits employers from "mak[ing] any deduction from the wages of an employee."  N.Y. Lab. Law § 193.  Plaintiff makes three arguments in support of this claim.  First, Plaintiff claims that TBS's alleged failure to pay Plaintiff's deferred compensation constituted an improper withholding under section 193.  (*See* Pl.'s Mem. 18.) However, because Plaintiff's underlying allegation that he is owed deferred compensation fails to withstand summary judgment, this claim also fails.

Second, Plaintiff claims that TBS violated section 193 by failing to pay Plaintiff the bonus due to him under the Incentive Program.  (*See id.*)  Again, this argument fails because Plaintiff has not established that he is owed an award under the Incentive Program.  This claim would fail in any event, as section 193 applies only to wages, not to "bonus" compensation such as that offered through the Incentive Program.  *See Ferrand v. Credit Lyonnais*, No. 02 Civ. 5191, 2003 WL 22251313, at *14 (S.D.N.Y. Sept. 30, 2003) ("By its very terms, including its title, § 193 applies to 'Deductions from Wages.' . . . The Court is not persuaded that § 193 is at all relevant to Ferrand's claim for bonus compensation . . . ."); *Truelove v. Ne. Capital & Advisory, Inc.*, 738 N.E.2d 770, 771-72 (N.Y. 2000) ("Courts have construed [the Labor Law definition of "wages"] as excluding certain forms of 'incentive compensation' that are . . . dependent, at least in part, on the financial success of the business enterprise."); *Gunthel v. Deutsche Bank AG*, 821 N.Y.S.2d 160, 161 (App. Div. 2006) ("[B]onus awards . . . do not

constitute 'wages' under Labor Law § 190(1).").

Finally, Plaintiff alleges that TBS was in violation of section 193 when it withheld, from the check it issued on May 8, 2003, money that it believed had been overpaid in Plaintiff's February 21, 2003 paycheck. (*See* Pl.'s Mem. 18.)  However, the May 8, 2003 payment to Plaintiff was not a wage payment under section 193, but rather payment for accrued PTO. (*See* Def.'s 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33.)  While the "wage supplements" of low-income workers earning less than six hundred dollars per week are protected under New York's labor laws, those of professionals in Plaintiff's pay range are not. *See* N.Y. Lab. Law § 198-c ("This section shall not apply to any person in a bona fide . . . professional capacity whose earnings are in excess of six hundred dollars a week."); *Ferrand*, 2003 WL 22251313, at *14 (holding that section 193 applies only to deductions from "wages").  Accordingly, TBS's Motion for Summary Judgment with respect to Plaintiff's section 193 claims is granted.

### III.  Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part.  The clerk of the Court is directed to terminate the Motion (Doc. No. 26).

SO ORDERED.

Dated:        February 27, 2007
              New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

20